NO ORAL ARGUMENT SCHEDULED

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

12-5173
———————————

ENRIQUE ACOSTA,                                                          Appellant,

    v.

MICHAEL G. NELSON, Doctor, *et al.*,                          Appellees.

———————————

**BRIEF FOR APPELLEES**
———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
———————————

RONALD C. MACHEN JR.
<u>United States Attorney</u>

R. CRAIG LAWRENCE
JUDITH A. KIDWELL
<u>Assistant United States Attorneys</u>

C.A. 09-1300

## **CERTIFICATE AS TO PARTIES, RULINGS AND RELATED CASES**

### **Parties**

Appellant is Enrique Acosta, a federal inmate.   Appellees are Dr. Michael G. Nelson and Dr. Betzy Hernandez-Ricoff (misspelled "Betsy" in the Case Caption) Between September 1999 through June 2006, Dr. Nelson was the Chief of Health Programs in the Health Services Division, Office of Medical Designation and Transportation, United States Federal Bureau of Prisons (BOP) in Washington, D.C. During September 2006, Dr. Hernandez-Ricoff was the Acting Chief of Health Programs in the Health Services Division, BOP in Washington, D.C.   *Amicus Curiae* appointed by the Court is Rena Andoh, Esq., Sheppard Mullin Richter & Hampton LLP.

### **Ruling Under Review**

At issue in this appeal are the April 24, 2012, Memorandum Opinion and Order by the Honorable Robert L. Wilkins, granting Dr. Michael G. Nelson's and Dr. Betzy Hernandez-Ricoff's motion for summary judgment.

### **Related Cases**

This case has not previously been before this Court.   This case was before the United States Court of Appeals for the Eleventh Circuit styled as *Acosta v. Watts*, 281 Fed. Appx. 906 (11th Cir. 2008).   There are no currently pending related cases.

ii

# **TABLE OF CONTENTS**

JURISDICTIONAL STATEMENT……………………………………………..1

QUESTIONS PRESENTED …………………………………………………….1

COUNTERSTATEMENT OF THE CASE ...........................................................1

    I.    Factual Background ........................................ …………………2

        A.    Acosta's Long-standing Injury and Medical Care……………...2

        B.    BOP's Policies on Medical Care for Inmates…………………..5

            1. Program Statement 6031.01, Patient Care………………5

            2. Program Statement 6010.02, Health Services
               Administration…………………………………………..7

            3. Program Statement 6270.01, Medical Designations
               and Referral Services for Federal Prisoners……………..7

    II.    Procedural Background ........................................................9

SUMMARY OF ARGUMENT ...........................................................11

ARGUMENT .......................................................................13

    I.    Standard of Review .......................................................13

    II.    The District Court Correctly Decided That The Doctors Were
        Entitled To Summary Judgment………………………………..14

        A.    The District Court Did Not Convert A Motion To Dismiss…..14

        B.    Acosta Proffered Insufficient Evidence Of An Objectively
            Serious Medical Need…………………………………...17

       C.    Acosta Proffered Insufficient Evidence Of Deliberate Indifference……………………………………………………...24

       D.    The Doctor' Decisions Were Consistent With BOP Policies…28

  III.   The Doctors Are Entitled To Qualified Immunity…………………...30

  IV.   Acosta Is Not Entitled To Injunctive Relief…………………………32

CONCLUSION ..................................................................................................33

Certificate of Compliance..................................................................................34

Certificate of Service ........................................................................................34

Addendum ………………………………………………………………………...35

# TABLE OF AUTHORITIES

**Federal Cases**

*Acosta v. Middlebrooks*,
  2007 WL 3012852 (N.D. Fla. 2007) ...................................................9
*Acosta v. Nelson*,
  2009 WL 1405850 (N.D. Fla. 2009) ...............................................10
*Acosta v. Watts*,
  281 Fed. Appx. 906 (11th Cir. 2008) ........................................ 2, 9, 10
*Anderson v. Creighton*,
  483 U.S. 635 (1987) ............................................................... 17, 30
*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................16
*Ashcroft v. al-Kidd*,
  553 U.S. __, 131 S. Ct. 2074 (2011) ...........................................16
*Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*,
  403 U.S. 388 (1971) .....................................................................1
*Blackmore v. Kalamazoo County*,
  390 F.3d 890 (6th Cir. 2004) .................................................. 17, 22
*Christianson v. Colt Indus. Operating Corp.*,
  486 U.S. 800 (1988) .............................................................. 15, 16
*Davis v. Passman*,
  442 U.S. 228 (1979) ..................................................................32
*Estelle v. Gamble*,
  429 U.S. 97 (1976) ..................................................... 17, 22, 23, 24
*Farmer v. Brennan*,
  511 U.S. 825 (1994) .............................................. 17, 24, 27, 29
*Farmer v. Moritsugu*,
  163 F.3d 610 (D.C. Cir. 1998).................................................. 28, 29
*Gutierrez v. Peters*,
  111 F.3d 1364 (7th Cir. 1997) ................................................ 17, 22
*Harlow v. Fitzgerald*,
  457 U.S. 800 (1982) ..................................................................30
*Harris v. District of Columbia*,
  932 F.2d 10 (D.C. Cir. 1991).......................................................30
*LaShawn A. v. Barry*,
  87 F.3d 1389 (D.C. Cir. 1996).....................................................15

*Mitchell v. Forsyth*,
 472 U.S. 511 (1985) ..................................................................30

*Napier v. Madison County*,
 238 F.3d 739 (6th Cir. 2001) .................................................22

*Pearson v. Callahan*,
 555 U.S. 223 (2009) ..................................................................31

*Potter v. District of Columbia*,
 558 F.3d 542 (D.C. Cir. 2009)...........................................13, 14

*\*Reichle v. Howard*,
 132 S.Ct. 2088 (2012) .........................................................17, 30

*Salazar v. Washington Metro. Transit Auth.*,
 401 F.3d 504 (D.C. Cir. 2005)...................................................13

*Saucier v. Katz*,
 533 U.S. 194 (2001) ...........................................................30, 31

*Scott v. Dist. of Columbia*,
 139 F.3d 940 (D.C. Cir. 1998)....................................................25

*Servs. Corp. v. Malesko*,
 534 U.S. 61 (2001) ....................................................................32

*Sherley v. Sebelius*,
 689 F.3d 776 (D.C. Cir. 2012)....................................................15

*\*Stanton v. Sims*,
 134 S. Ct. 3 (2013)..............................................................17, 30

*Waterhouse v. District of Columbia*,
 298 F.3d 989 (D.C. Cir. 2002)....................................................14

*Whitley v. Albers*,
 475 U.S. 312 (1986) ...........................................................24, 25

**Cases chiefly relied upon are marked with asterisks.**

**Federal Statutes**

28 U.S.C. § 1291 ............................................................................1
28 U.S.C. § 1331 ............................................................................1
28 U.S.C. § 1915(e)(2)(B)(ii) .........................................................9

**Federal Rules**

Fed. R. Civ. P. 12(d) ....................................................................14

## **GLOSSARY OF ABBREVIATIONS**

BOP =                    Federal Bureau of Prisons

FCI =                    Federal Correctional Institution

Level A =                Medically Necessary - Acute or Emergent. This level of care covers medical conditions that are of an immediate, acute or emergent nature, which without care would cause rapid deterioration of the inmate's health, significant irreversible loss of function, or may be life-threatening.

Level B =                Medically Necessary - Non-Emergent. This level of care covers medical conditions that are not immediately life-threatening but which without care the inmate could not be maintained without significant risk of serious deterioration leading to premature death, significant reduction in the possibility of repair later without present treatment, or significant pain or discomfort which impairs the inmates participation in activities of daily living. Examples of these medical conditions include, but are not limited to, chronic conditions (diabetes, heart disease, bipolar disorder, schizophrenia), infectious disorders (HIV, tuberculosis) and cancer.

Level C =                Medically Acceptable - Not Always Necessary.   This level of care covers medical conditions which are considered elective procedures, when treatment may improve the inmate's quality of life. Examples of these medical conditions include, but are not limited to, joint replacement, reconstruction of the anterior cruciate ligament of the knee, and treatment of non-cancerous skin conditions.

Level D =                Limited Medical Value. This level of care covers medical conditions in which treatment provides little or no medical value, are not likely to provide substantial long-term gain, or are expressly for the inmate's convenience.

vii

Level E =         Extraordinary. This level of care covers medical
                  interventions if they affect the life of another individual,
                  such as organ transplantation, or are investigational in
                  nature.

OMDT =            Office of Medical Designations and Transportation

URC =             Utilization Review Committee

## JURISDICTIONAL STATEMENT

The District Court has jurisdiction pursuant to 28 U.S.C. § 1331 and *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388 (1971).   This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291 to review the final judgment of the District Court granting summary judgment in favor of the Appellees.   Further, Acosta's appeal was timely because he filed his Notice of Appeal on May 25, 2012, which was 31 days after entry of the District Court's judgment.   A-256, A-258.

## QUESTIONS PRESENTED

In Appellees' opinion, this appeal presents the following issues:

1.      Whether the District Court correctly granted summary judgment in favor of Appellees on the basis that Acosta had failed to raise a genuine issue of material fact that Appellees had violated the Eighth Amendment by denying Acosta's transfer to a BOP medical referral for elective surgery?

2.      Whether, in the alternative, Appellees are entitled to qualified immunity?

3.      Whether, in the alternative, Acosta is entitled to injunctive relief?

## COUNTERSTATEMENT OF THE CASE

This case arises under *Bivens* and involves the claims of Enrique Acosta, a federal prisoner.   Acosta sues both Dr. Michael G. Nelson and Dr. Betzy Hernandez-Ricoff (also referred to as "the Doctors") for denying his transfer in 2006

to a BOP medical referral center for the purpose of having elective surgery on his elbow and arm.

This is the second appeal in this case.   *See Acosta v. Watts*, 281 Fed. Appx. 906 (11th Cir. 2008).

As discussed below, the District Court was correct in granting the Doctors' motion for summary judgment.   Acosta failed to proffer sufficient evidence to create a genuine issue of material fact that the Doctors were deliberately indifferent to a serious medical need.   Furthermore, the Doctors' actions were consistent with BOP's established constitutional policies to provide health care based on the seriousness of inmates' medical conditions in order to fulfill BOP's duty to provide medically necessary care to all inmates.   In any event, the Doctors are entitled to qualified immunity because the denial of an inmate's transfer to a BOP medical referral center for elective surgery did not violate clearly established Eighth Amendment law.   Finally, Acosta is not entitled to injunctive relief in this *Bivens* action.

## I.    Factual Background

### A.   Acosta's Long-standing Injury and Medical Care

Approximately ten years prior to the beginning of Acosta's incarceration, he injured his right elbow in a car accident. A-27, 79, 80, 84.   In March 2005, a

doctor at the Federal Correctional Institution (FCI) in Jesup, Georgia referred

Acosta to an orthopedic surgeon for a consultation regarding Acosta's elbow.

A-119.   The orthopedic surgeon diagnosed Acosta with "right elbow ankylosis and

segmental defect of the ulna," and stated in his report "[T]his is a difficult problem

that can be improved by repair of defect and debridement of elbow – would

recommend this be done at Rochester." *Id.* "Ankylosis" (from Greek, meaning bent

or crooked) is a stiffness of a joint due to abnormal adhesion and rigidity of the

bones of the joint, which may be the result of injury or disease.  *See*

*http://en.wikipedia.org/wiki/*.   The "ulna" or elbow bone is one of the two long

bones in the forearm.   *Id.*   "Debridement" is the medical removal of dead,

damaged or infected tissue to improve the healing potential of healthy tissue.   *Id.*

    In April 2005, Acosta was transferred to a FCI in Marianna, Florida.

A-84 ¶ 2.   In June 2005, the Clinical Director at FCI Marianna denied the request to

transfer Acosta to a BOP medical referral center for the recommended surgery.

A-117.   Acosta did not appeal the Clinical Director's June 2005 denial.

    In July 2006, however, Dr. Tanguilig, a staff physician at FCI Marianna

examined Acosta and referred a request to the Office of Medical Designations and

Transportation (also referred to as "OMDT") .   A-122.   During the examination,

Acosta was "Alert, oriented, in no apparent distress."   A-123.   The referral

requested a transfer, also referred to as a "re-designation," of Acosta to a medical referral center.   A-122, A-126.

In September 2006, Dr. Nelson reviewed and denied the referral request from Dr. Tanguilig to transfer Acosta to a medical referral center for evaluation and treatment based upon the available medical information.   A-126, A-128. Notwithstanding this denial, Dr. Nelson also requested additional medical information regarding Acosta's functional limitations and questioned whether Acosta's condition was stable or getting worse.   A-126-128.

In response to Dr. Nelson's questions concerning Acosta's current medical condition, Dr. Tanguilig conducted a follow-up examination five days later and reported in an addendum to the initial referral request that Acosta:

> still has the same degree of limitations on the use of his right upper extremity. The range of motion is from 90 to 135 degree range.   He continues to be the pitcher in his softball team.   He uses his affected arm to throw the ball. His team won the tournament this summer.   He has the same functional problem with his right hand/elbow since the accident of 1983.   He has good grip in both hands.   The use of his right hand is limited by his inability to fully extend and flex the elbow.

A-80.   Thereafter, Dr. Hernandez-Ricoff, who was the Acting Chief of Health Programs at the time, denied the referral request to transfer Acosta to a BOP medical referral center based upon available medical information, information indicating that limitations in Acosta's range of motion were not affecting his activities of daily

4

living, and the scope of medical services being provided to Acosta by BOP.

A-130-131.

### B. BOP's Policies on Medical Care for Inmates

The BOP's policies and directives concerning medical care for inmates are

contained, *inter alia*, in program statements issued by the agency.   *See*

*www.bop.gov/policy*.   "Providing health care within a correctional environment

presents unique challenges not encountered by practitioners elsewhere."   A-194

¶ 5.   Health care for inmates is mandated in accordance with proven standards of

care.   A-132 ¶ 2.   "Medically necessary interventions will aim to improve inmate

functioning to a level that facilitates performance of activities of daily living within

the correctional environment."   A-195 ¶ 5.

### 1. Program Statement 6031.01, Patient Care

The BOP *Patient Care* policy, Program Statement 6031.01, establishes five

major categories defining the level of care to be provided to inmates based on the

seriousness of inmates' medical conditions.   A-135 ¶ 7.   The highest medical

priority is (A) "Medically Necessary-Acute or Emergent" followed in decreasing

order of severity by (B) "Medically Necessary-Non-Emergent"; (C) "Medically

Acceptable-Not Always Necessary"; and (D) "Limited Medical Value," with

category (E) "Extraordinary" for situations such as risks to third parties or

investigational procedures.   A-136, 137 ¶¶ 7a-e.

Category C, "Medically Acceptable-Not Always Necessary," covers

"[m]edical conditions which are considered elective procedures, when treatment

may improve the inmate's quality of life."   A-136.   Relevant examples of

conditions considered under this category are:

- joint replacement;
- reconstruction of the anterior cruciate ligament of the knee; and
- treatment of non-cancerous skin conditions.

A-136-137.   These therapeutic interventions always require review by the

Utilization Review Committee (also referred to as the "URC"), while Category B,

"Medically Necessary – Acute or Emergent," does not require URC review prior to

the treatment being provided.   A-138.   Every institution is required to have a

Utilization Review Committee chaired by the Clinical Director.   A-137 ¶ 8.

Relevant factors to consider in approving the proposed treatment in Category C

include, but are not limited to:

- the risks and benefits of the treatment;
- available resources;
- natural history of the condition; and
- the effect of the intervention on inmate functioning in his/her activities of
  daily living."

*Id*.

The Clinical Director, as chair of the URC, is the final authority for all URC

decisions.   A-138.   "The CD is under no obligation to follow consultant

recommendations."   A-139.   The CD may request a secondary review for

treatments or procedures in Categories C on a case-by-case basis through the

Regional Clinical Specialty Consultants or a Central Office physician."   *Id*.

## 2.  Program Statement 6010.02, Health Services Administration

BOP Program Statement 6010.02 describes the mission and organizational

structure of the Health Services Division (HSD).   A-192-229.   It also defines the

major duties and responsibilities of BOP medical personnel.   *Id*.

## 3.   Program Statement 6270.01
## Medical Designations and Referral Services For Federal Prisoners

BOP Program Statement 6270.01 specifies the procedures and criteria for

transporting inmates who require medical care.   *See* Addendum ("Addm."); *see*

*also* A-47 ( cited as Program Statement 6220.01 in Amended Complaint).   Pursuant

to this program statement, "the Central Office Medical Designator, Office of

Medical Designations and Transportation (OMDT) makes medical designations."

Addm. ¶ 1.   OMDT assigns inmates to Medical Referral Centers, institutions with

resources, or non-Bureau community contract care resources.   *Id*.   The Medical

Designator makes designations, referrals, and denials based on the following

factors:

7

- Urgency of need;
- Cost-effectiveness;
- Bureau institution capabilities;
- Expected service period, including recuperation;
- Current bed space availability;
- Security; and
- Consultation with Bureau of Prisons (Bureau) physicians at the sending and receiving institutions.

*Id*.

This program statement provides that re-designations, commonly referred to as transfers, to another facility "are initiated for inmates with an acute medical, surgical, or psychiatric condition, or for those inmates who have chronic care needs that cannot be addressed at the parent institution. *Id*. at 5. "All transfer requests for medical, surgical, or psychiatric designations will be done . . . on the Medical/Surgical and Psychiatric Referral Request form (BP-S770). *Id*. at 7.

In addition, this program statement provides that "the Medical Designator will review each request for re-designation and approve or deny the requested transfer." *Id*. ¶ 9. If an inmate is approved for medical re-designation, the Medical Designator will select the most appropriate medical referral center based on the following:

- the inmates' medical needs;
- his/her security/custody level;
- CIMS considerations (e.g. separates); and
- bed space availability.

*Id*.

8

**Procedural Background**

In April 2007, Acosta filed suit against the Warden, the Clinical Director, a staff physician and a mid-level practitioner at FCI Marianna.   A-22.   Attached to his original complaint were several attachments concerning his informal resolution attempts and administrative remedy requests.

In August 2007, Acosta filed an amended complaint, without attachments, invoking *Bivens* and naming Harrell Watts, Administrator of National Inmate Appeals, and unknown personnel of the OMDT as Defendants.[1]   A-40; *see Acosta v. Watts*, 281 Fed. Appx. at 906.   The United States District Court for the Northern District of Florida dismissed Acosta's complaint *sua sponte*.   *Id.*, *see Acosta v. Middlebrooks*, No. 07cv82, 2007 WL 3012852 (N.D. Fla. Oct. 12, 2007) (dismissing action with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii)).   The United States Court of Appeals for the Eleventh Circuit affirmed the dismissal of the claims against Watts (who had been sued by Acosta for making the final decision denying Acosta's administrative appeal requesting surgery), but reversed the Florida District Court's dismissal of Acosta's other claims against the unknown personnel of the Office of Medical Designations and Transportation and remanded the case to the

---

[1] These attachments are contained in the Appendix and *Amicus* cites to them. However, these documents were not submitted by either Acosta or the Doctors for purposes of summary judgment.

9

Florida District Court.   *See Acosta v. Watts*, 281 Fed. Appx. at 906.

On remand, the matter was referred to a Magistrate Judge for further
proceedings.   *See Acosta v. Nelson*, No. 07cv82, 2009 WL 1405850 (N.D. Fla. May
19, 2009).   In proceedings before the Magistrate Judge, the Doctors were identified
as the unknown personnel-defendants, and they moved to dismiss or in the
alternative, for summary judgment, *inter alia*, on the bases of lack of personal
jurisdiction, improper venue and failure to state a claim upon which relief could be
granted.   *Id*.   The motion was denied without prejudice, and Acosta's case was
transferred to the U.S. District Court for the District of Columbia.   A-15.

The Doctors again moved to dismiss Acosta's amended complaint or in the
alternative, for summary judgment. A-16, ECF Nos. 7, 8.   One of the bases for
moving to dismiss Acosta's amended complaint was lack of personal jurisdiction
over the Doctors.   Acosta was advised of the consequences of not responding to the
Doctors' motion in a notice contained within the doctors' motion, A-59, 60, and by
separate Order of the District Court.   A-16, ECF No. 10.   Thereafter, Acosta filed
an opposition to the Doctors' motion with his attached declaration.   A-231.   The
District Court stayed the case for two months and ordered the United States
Marshals Service to serve the two Doctors.   A-16, ECF No. 14.   In April 2012, the
District Court granted the Doctors motion for summary judgment.   A-249-257.

10

This appeal ensued.   A-258.

## SUMMARY OF ARGUMENT

Dr. Nelson and Dr. Hernandez-Ricoff were entitled to summary judgment because the evidence in the record was insufficient to raise triable issues that either Doctor had acted with deliberate indifference to a serious medical need.   The undisputed facts cannot support an inference that denial of a transfer to a BOP medical referral center for elective surgery posed a substantial risk of serious harm to Acosta.   The only doctor of record that ever recommended surgery for Acosta was a consulting orthopedic surgeon.   He stated only that "[T]his is a difficult problem that can be improved."   He did not indicate that Acosta was at a substantial risk of harm nor opine that Acosta's medical condition was continuing to deteriorate. Nor did he indicate that Acosta would be able to perform certain movements or be free of pain after the surgery.   Furthermore, this consulting doctor did not have final approval authority for surgery for a federal inmate.   In fact, BOP is under no obligation to follow the recommendation of a consultant.

Similarly, the medical reports from the FCI Marianna medical staff, on which the Doctors' based their denials for transfer of Acosta to a medical referral center, indicate that upon examination, Acosta was " in no apparent distress."   The medical reports also indicate that Acosta was the pitcher on his softball team and used his

11

affected arm to throw the softball.

More significantly, in September 2006, after Dr. Nelson made inquiries concerning Acosta's current medical condition, a BOP staff physician conducted a follow-up exam of Acosta and reported that Acosta had the same functional problem with his right hand and elbow that he had since his accident in 1983, and that Acosta was continuing to play softball with his affected arm.   Based on this medical information, Dr. Hernandez-Ricoff determined that Acosta's range of motion was not affecting his activities of daily living, and she denied the transfer request to a medical referral center.   This decision was in keeping with BOP policy that re-designations to another facility "are initiated for inmates with an acute medical, surgical, or psychiatric condition, or for those who have chronic care needs that cannot be addressed at the parent institution."

There is no evidence in the record that Acosta had a serious medical need or that he faced a substantial risk of serious harm if he did not receive surgery for his long-standing injury.   Furthermore, there is no evidence in the record that the decisions of Dr. Nelson or Dr. Hernandez-Ricoff were a substantial departure from accepted professional judgment or standards, or that their decisions were not in compliance with BOP's medical policies.   Hence, there was no evidence from which a reasonable jury could conclude that the Doctors were deliberately

12

indifferent to a serious medical need in violation of the Eighth Amendment.

      In any event, even assuming *arguendo* that a constitutional violation were established, the Doctors are entitled to qualified immunity.   At the time the Doctors made their decisions, the law was not so clearly established that BOP Doctors in Dr. Nelson's or Dr. Hernandez-Ricoff's positions, with the available medical information, should have known that, despite their compliance with BOP policies, their denials of Acosta's transfer to a BOP medical referral center for elective surgery violated the Eighth Amendment.

      Finally, Acosta is not entitled to injunctive relief in a *Bivens* action.   The Doctors have no authority in their personal capacities to authorize the transfer of an inmate to a BOP medical referral center for surgery.   Furthermore, BOP is not a party to this suit.   Thus, Acosta's request for a court to order BOP to provide him with surgery must be denied.

**ARGUMENT**

**I.**    **STANDARD OF REVIEW**.

      This Court reviews *de novo* a district courts grant of summary judgment. *Salazar v. Washington Metro. Transit Auth.*, 401 F.3d 504, 507 (D.C. Cir. 2005). This Courts independent determination, however, is limited insofar as it reviews only arguments made in the District Court, absent exceptional circumstances.   *See*

13

*Potter v. District of Columbia*, 558 F.3d 542, 547 (D.C. Cir. 2009).   A party

generally should not make an argument for the first time on appeal, and "issues and

legal theories not asserted at the District Court level ordinarily will not be heard."

*Id*. at 547, 550.   Furthermore, the District Court commits no error in refusing to sift

through the record in search of alternative arguments or support for arguments made

by the parties.   *Id*.; *Waterhouse v. District of Columbia*, 298 F.3d 989, 991-92 (D.C.

Cir. 2002).

 This appeal presents the legal question of whether Dr. Nelson or Dr.

Hernandez-Ricoff violated the Eighth Amendment's proscription against cruel and

unusual punishment by being deliberately indifferent to any serious medical needs

of Acosta.

## II. THE DISTRICT COURT CORRECTLY DECIDED THAT THE DOCTORS WERE ENTITLED TO SUMMARY JUDGMENT.

### A. The District Court Did Not Convert A Motion To Dismiss.

 As an initial matter, *Amicus* asserts that the District Court

improperly converted the Doctors' motion to dismiss to a motion for summary

judgment without any notice to Acosta.   *Amicus* Br. at 16; *see* Fed. R. Civ. P. 12(d).

*Amicus*, however, misapprehends the proceedings below.

 The Doctors moved to dismiss or alternatively, for summary judgment.

A-59.   More importantly, Acosta was provided notice in the Doctors' summary

14

judgment motion and by a separate order of the District Court.   A-59, A-16, ECF

No. 10.   Indeed, it is apparent that Acosta understood the proceedings because he

not only filed an opposition responding to the motion, but he included his own

declaration in support.   A-231, A-238.   Hence, any argument that the District

Court improperly converted a motion to dismiss to a motion for summary judgment

is without merit.

   *Amicus* also argues that the Doctors' motion to dismiss was improper

because the Eleventh Circuit had previously held that Acosta had stated a cognizable

claim against the Doctors, and, therefore, the doctrine of law-of-the- case requires

that this case be remanded for trial or at least for additional discovery.   Amicus Br.

at 15-16.   This doctrine, however, is not quite as rigid as *Amicus* suggests.

   While it is true that under the "law-of-the-case" doctrine, "'the *same* issue

presented a second time in the *same* case in the *same court* should lead to the *same*

*result*,' " *Sherley v. Sebelius*, 689 F.3d 776, 780-81 (D.C. Cir. 2012) (quoting

*LaShawn A. v. Barry*, 87 F.3d 1389, 1393 (D.C.Cir. 1996) (original emphasis), "[a]

court has the power to revisit prior decisions of its own or of a coordinate court in

any circumstance."   *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800,

817 (1988).   In "extraordinary circumstances such as where the initial decision was

clearly erroneous and would work a manifest injustice," it is appropriate to revisit a

prior decision.   *Christianson*, 486 U.S. at 817 (internal quotation marks omitted).

In Acosta's first appeal, the Eleventh Circuit's opinion relied on opinions decided by that court in the 1980s, and prior to *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), in analyzing whether Acosta's complaint was sufficient to survive a motion to dismiss for failure to state a claim.   *See* A-55.   The Eleventh Circuit opined that the "threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is . . . 'exceedingly low.'"   *Id*.   In *Iqbal*, however, the Supreme Court held that "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief."   *Id.* at 678.   Pursuant to the holding in *Iqbal*, Acosta was required to plead "factual matter" that would permit a court to infer "more than the mere possibility of misconduct."   *Iqbal*, 556 U.S. at 679.

Furthermore, because Acosta had invoked *Bivens*, he was required to "[plead] facts showing (1) that [the Doctors] violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. __, 131 S. Ct. 2074 , 2080 (2011).   An official's conduct "violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable

16

official would have understood that what he is doing violates that right.'"   *Id*. at

2083 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).   Although a case

directly on point is not required, "existing precedent must have placed the statutory

or constitutional question beyond debate."   *Id*.; *see Stanton v. Sims*, 134 S. Ct. 3

(2013); *Reichle v. Howard*, 132 S. Ct. 2088 (2012).

### B. Acosta Failed To Proffer Sufficient Evidence Of An Objectively Serious Medical Need.

In the medical context, the Eighth Amendment is violated only when prison

officials are deliberately indifferent to the serious medical needs of prisoners.

*Estelle v. Gamble*, 429 U.S. 97, 104 (1976).   Deliberate indifference to serious

medical needs of prisoners constitutes the "unnecessary and wanton infliction of

pain" proscribed by the Eighth Amendment.   *Id*. at 104-05. (citation omitted).   The

deliberate indifference standard includes both an objective component (seriousness

of harm) and a subjective component (culpable state of mind).   *Farmer v. Brennan*,

511 U.S. 825 (1994).   The objective component of the deliberate indifference

standard requires a plaintiff to show the existence of a "sufficiently serious" medical

need.   *Farmer*, 511 U.S. at 834.   As clarified by a number of courts, a "serious"

medical need is one that "has been diagnosed by a physician as mandating or

requiring treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention."   *Blackmore v. Kalamazoo County*,

17

390 F.3d 890, 897 (6th Cir. 2004); *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (1997).

While it is true that Acosta had a deformity because of his injury, that fact alone does not transform his old injury into a serious medical need for purposes of Eighth Amendment analysis.   A-80.   Acosta failed to proffer any evidence that any doctor, either before or after his incarceration, had ever determined that he was at substantial risk of serious harm without surgery for his long-standing injury.   The record evidence shows that a consulting orthopedic surgeon, Dr. Hein, diagnosed and recommended surgery in 2005.   A-119.   Dr. Hein opined that "This is a difficult *problem* that can be *improved* by repair of defect [of the ulna] and debridement of elbow – would recommend this be done at Rochester."   A-119 (emphasis added).   There is nothing to suggest that Dr. Hein did any more than recommend surgery, and *Amicus* does not dispute that this was a *recommendation* for surgery.   Amicus Brief ("Br.") at 11.   More importantly, Dr. Hein did not have final approval authority.   Indeed, pursuant to BOP policy, a Clinical Director is under no obligation to follow a consultant's recommendation.   A-139.   Moreover, there is nothing in Dr. Hein's report to support an argument that Acosta's arm or elbow were worsening or that Acosta's old injury was life-threatening.   In fact, there is no evidence that in the 20 years after Acosta's accident any doctor, other than Dr. Hein, had ever recommended surgery for Acosta's arm or elbow.

In arguing that Acosta had a serious medical need, *Amicus* posits that Dr. Tanguilig and Dr. Guzman commented on the seriousness of Acosta's condition and "stated that Mr. Acosta had a 'gross deformity' of his right elbow which would require 'long term inpatient care/physical rehabilitation services." Amicus Br. at 11. The evidence A*micus* quotes is, however, taken out of context and fails to support her argument.

The evidence shows that pursuant to BOP policy, Dr. Tanguilig and Dr. Guzman made a request for a medical re-designation of Acosta to OMDT, Central Office on form BP-S770, *Medical/Surgical and Psychiatric Referral Request*. *See* A-79 ; Addm. ¶ 7. This is a pre-printed form which requires that certain information be provided to the OMDT so that OMDT can make a decision about transferring or re-designating an inmate. *See* A-79. "The BP-S770 serves as the designation, transportation, and security worksheet from which the actual designation is made." Addm. ¶ 9. It is "used to document the inmate's condition and the reason for the transfer." *Id*. OMDT then reviews this form for re-designation and either approves or denies the request. *Id*. Pursuant to BOP policy, re-designations to another facility "are initiated for inmates with an acute medical, surgical, or psychiatric condition, or for those inmates who have chronic

19

care needs that cannot be addressed at the parent institution.   Addm. ¶ 5.

On the first page of the referral request for Acosta, there are the following questions and answers:

Is required treatment available in local community:   "x" Yes     No

If not, please explain:   "Patient will require long term inpatient care/physical rehabilitative services."

A-79.   It is obvious that Dr. Tanguilig is not commenting on the seriousness of Acosta's medical condition, but instead, he is conveying to OMDT why a transfer to a medical referral center would be needed if Acosta has surgery on his elbow and arm.   The BP-S770 is not, as *Amicus* suggests, a recommendation for surgery on Acosta's arm or elbow by a doctor.

Moreover, the information concerning the "gross deformity" of Acosta's right elbow is on the second page of the request form under a heading of "Physical Exam."   A-80.   It is equally obvious that Dr. Tanguilig was merely recording what he observed during the physical exam.   He also noted that Acosta was "Alert, oriented, in no apparent distress."   *Id*.

In similar fashion, *Amicus* asserts that "The Regional Director, when reviewing Mr. Acosta's file, also noted that Mr. Acosta's condition was sufficiently severe to warrant 'extensive surgery and post surgical rehabilitation.'"   Yet, the

20

evidence is quite to the contrary.   The document *Amicus* cites to in support of her

argument was one of the exhibits to Acosta's initial complaint.   *See* Amicus Br. at

11-12, 21-22; A-37.   This document is a denial of Acosta's regional administrative

remedy appeal seeking immediate surgical repair of his arm.   A-37.   The document

informs Acosta that his appeal is being denied and of information learned during an

inquiry of Acosta's request.   This document also advised Acosta that in accordance

with Program Statement 6270.01, Medical Designations & Referral Services for

Federal Prisoners, a transfer request has been sent to the Office of Medical

Designations.   *Id.*   There is simply nothing in this document to support an

argument that this is evidence of a serious medical need for Eighth Amendment

purposes.

Next, *Amicus* suggests on appeal that Acosta's injury is getting worse

*Amicus* Br. at 8.   To support this contention, *Amicus* contrasts two measurements

recorded in Acosta's medical records, that is, July 11, 2006 of ~90 degrees to ~140

degrees with a recorded measurement two months later on September 11, 2006 of

~90 to ~135 degrees.   *Id.*   There are, however, significant problems with *Amicus*'

attempt to demonstrate that without surgery Acosta was being subjected to a

substantial risk of serious harm.

First and foremost, *Amicus* fails to provide any medical explanation of the

21

meaning of these numbers.   Secondly, *Amicus* fails to provide any medical

evidence from the record which would support a finding that a difference in these

numbers indicated a worsening of Acosta's condition.   Finally, the record evidence

describing these two measurements indicates that the July measurement is "of the

right elbow with limited flexion" while the September measurement is of "the range

of motion" of Acosta's "right upper extremity."   A-80.   Hence, it appears that

*Amicus* is comparing apples to oranges in trying to demonstrate that Acosta's injury

worsened in two months.   Certainly, these measurements fail to constitute medical

evidence that Acosta's medical need was serious or that he was at substantial risk of

serious harm.   Amicus Br. at 19.   Indeed, without any medical verification, these

numbers have no evidentiary significance.   *See Napier v. Madison County*, 238

F.3d 739, 741-742 (6th Cir. 2001) (requiring a plaintiff to "place verifying medical

evidence in the record to establish the detrimental effect of the delay in medical

treatment"); *see also Blackmore v. Kalamazoo County*, 390 F.3d at 897-98.

(clarifying that *Napier* controls in cases where claims are for minor injuries or

non-obvious complaints).

Finally, *Amicus*, in arguing that Acosta was at a substantial risk of serious

harm, quotes *Gutierrez*, that "the Court [in *Estelle*] never questioned that the

inmate's allegations of severe pain from his back injury were sufficiently serious to

22

support his Eighth Amendment claim." *Gutierrez*, 111 F.3d at 1371 (citing to *Estelle*, 429 at 107). *Amicus* Br. at 19. Amicus' reliance on this case is misplaced.

In *Estelle*, the Supreme Court held that the *pro se* prisoner's complaint was insufficient to state a cause of action against a physician both in his capacity as treating physician and as medical director of the corrections department. *Estelle*, 429 U.S. at 108. Indeed, the *pro se* prisoner had been treated with bed rest, muscle relaxants and pain relievers for an injury to his lower back. *Id*. at 107. The Court explained that "the question whether an X-ray or additional diagnostic techniques or forms of treatment is indicated is a classic example of a matter for medical judgment." *Id.* More importantly, in *Estelle*, the Supreme Court was reviewing the dismissal of the *pro se* prisoner's complaint, not the granting of summary judgment by a district court. *Estelle*, 429 U.S. at 97.

Furthermore, Acosta never even mentions pain in his own declaration explaining how his injury affected his activities, and this declaration was in opposition to the Doctors' motion for summary judgment. A-238, 239. The record medical evidence also fails to support any allegations of severe pain. A-80, 123.

It is also difficult to imagine that any lay person would easily recognize the necessity for surgery for Acosta's 20-year old injury. There is no evidence that

Acosta sought surgery in the ten years prior to his incarceration.   And, the medical

evidence in the record shows that he had the same degree of limitations on the use of

his right upper extremity.   A-80.   Moreover, it would be relevant to a lay person

that Acosta had been playing the position of a pitcher on a softball team using his

deformed elbow and arm.   *Id*.

There is nothing in the record to support Acosta's argument that he had a

serious medical need for purposes of an Eighth Amendment analysis.   The District

Court's decision should, therefore, be affirmed.

### C. Acosta Failed To Proffer Sufficient Evidence Of Subjective Deliberate Indifference.

A prison official cannot act with deliberate indifference "unless the official

knows of and disregards an excessive risk to inmate health or safety; the official

must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference."

*Farmer*, 511 U.S. at 837.   "Eighth Amendment liability requires 'more than

ordinary lack of due care for the prisoner's interests or safety.'"   *Farmer*, 511 U.S.

at 835 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 (1986)).   Deliberate

indifference is the reckless disregard of a substantial risk of serious harm; mere

negligence will not suffice.   *Id*. at 835-36.   Furthermore, a prison official is not

required to provide every medical treatment that an inmate seeks.   *Estelle*, 429 U.S.

at 105.

Here, Acosta failed to proffer any evidence to demonstrate that the Doctors acted with the "obduracy" and "wantonness" that mark deliberate indifference. *See Scott v. Dist. of Columbia*, 139 F.3d 940, 944 (D.C. Cir. 1998) (quoting *Whitley v. Albers*, 475 U.S. at 319). Instead, the evidence in the record shows that the Doctors made their decisions on whether to transfer to Acosta to a medical referral center based upon the available medical evidence and BOP policies. That medical evidence showed that: Acosta had a 20-year old injury as the result of a car accident in 1983 or 1984. A-79, 80, 84. In March 2005, Acosta was diagnosed by a consulting orthopedic surgeon with right elbow ankylosis and segmental defect of the ulna. A-119. The consulting orthopedic surgeon opined that Acosta's injury was "a difficult problem that could be improved by repair of the defect and debridement of the elbow. A-119. During a July 2006 medical exam, Acosta was "alert, oriented, in no apparent distress. A-122. During a follow-up September 2006 exam, Acosta still had the same degree of limitations on the use of his right upper extremity, still had the same functional problem with his right hand and elbow that he had had since his accident in 1983, and had good grip in both hands. A-80. The the use of Acosta's right hand was limited by his ability to fully extend and flex his elbow, but Acosta was continuing to be the pitcher on his softball team and

25

used his affected arm to throw the softball. *Id*. The medical evidence also showed that Acosta was receiving treatment for his injured elbow and arm, including painkillers, as well as, for his other injuries sustained while playing softball. A-80, 116-118, 123.

In order to demonstrate deliberate indifference, *Amicus* argues that the Doctors interfered with treatment that had been prescribed by a number of doctors. Amicus Br. at 21-22. *Amicus* also asserts that Acosta's limitations raise material issues of fact on the issue of deliberate indifference because there is no evidence that Dr. Hernandez-Ricoff had information on how Acosta's injury was affecting his daily activities. Amicus Br. at 22- 23. On both points, *Amicus*' arguments are unavailing.

There is no evidence in the record that any doctor, other than Dr. Hein, had ever recommended surgery for Acosta's injury. Indeed, *Amicus*' reliance on the Regional Director's denial of Acosta's administrative appeal to suggest otherwise is unwarranted. Amicus Br. at 21-22. There is nothing in that denial response which indicates that the URC had approved surgery for Acosta.

Furthermore, the limitations listed in Acosta's declaration do not create a genuine issue of material fact on whether the Doctors were deliberately indifferent. These limitations do not constitute a substantial risk of serious harm to Acosta.

26

A-238, 239.    Also, the affected daily activities he lists in his declaration could just

as easily be performed with his left hand.    *Id*.    Moreover, Acosta's declaration

indicates a "limited range" and a "limited use of my right hand," not a total

uselessness of his right hand.    A-239 ¶ 17.    Thus, to suggest that by not inquiring

into all of the limitations resulting from Acosta's injury an inference of deliberate

indifference can be made is without merit.    Especially in light of the fact that Acosta

had lived with these limitations for ten years prior to his incarceration.

More importantly, Dr. Hernandez-Ricoff had information that Acosta was a

pitcher on a softball team and was pitching with his right hand.    A-80.    She also

had information from his recent medical exam that "He has good grip in both hands"

and that "The use of his right hand is limited by his inability to fully extend and flex

the elbow."    A-80.    She was not required to know each and every activity that

might be affected by Acosta's injury, including his potential "driving."    A-239.

Hence, Amicus' argument that the Doctors showed deliberate indifference by failing

to take reasonable steps to abate a substantial risk of serious harm to Acosta is

meritless.    *See Farmer v. Brennan*, 511 U.S. at 835-847.

Finally, as discussed below, the Doctors' denials of the request to transfer

Acosta to a BOP medical referral center were in compliance with BOP's logical

system of policies and procedures.    This system is designed "to effectively deliver

27

medically necessary health care to inmates" throughout the United States.[2]   A-132

through A-191; A-192 through A-229.

## D. The Doctors' Decisions Were Consistent With BOP's Policies

Neither Acosta nor *Amicus* challenge the constitutionality of BOP's medical

policies, and these policies have been upheld by this Court as constitutional.   *See*

*Farmer v. Moritsugu*, 163 F.3d 610 (D.C. Cir. 1998).    Pursuant to these BOP

policies, determinations for certain treatments, such as surgery, are based upon a

classification of the seriousness of inmates' medical conditions.   A-136, 137.

*Amicus* posits that Acosta's medical condition fell under Level B in the

classification system.   *Amicus* Br. at 10, 22.   Even a cursory review of the

description of Level B, however, belies any suggestion that Acosta's medical

condition fell within this definition.   Level B covers medical conditions that "are

not immediately life-threatening, but which without care the inmate could not be

maintained without significant risk of serious deterioration leading to premature

death, significant reduction in the possibility of repair later without present

treatment, or significant pain or discomfort which impairs the inmates participation

in activities of daily living."   A-136.   In addition, prior URC review is not required

---

[2] As of July 25, 2013, there were 176,387 inmates in BOP facilities and a total
of 219,187 Federal inmates.   S*ee www.bop.gov/news/medresources*.

28

for therapeutic interventions for Level B conditions, because of the seriousness of these medical conditions.   A-138.   Examples of Level B medical conditions include chronic conditions, such as diabetes, heart disease, bipolar disorder, schizophrenia, infectious disorders, such as HIV and tuberculosis, and cancer.   *Id*.

There is no medical evidence in the record to support an argument that Acosta's old injury was on the scale of these referenced medical conditions. Certainly, it cannot be said that Acosta's old injury put him at significant risk of serious deterioration leading to premature death, and there is no medical evidence in the record that without present treatment the possibility of repair on his elbow and arm later would be decreased.   A-136.

Moreover, BOP policies provide for the OMDT personnel to make the very kind of decisions that were made by the Doctors in Acosta's case, that is, whether to approve the re-designation of an inmate.   Two of the factors in making a decision for medical designations are "urgency of need" and "expected service period, including recuperation.   Addm. ¶ 1.   In addition, the OMDT considers other issues such as the length of stay and whether there are available community resources. Addm. ¶ 5.   This information appeared on the BP-S770 which was sent to the Doctors and used in their decisions to deny a transfer for Acosta.   A-79-80. Indeed, the fact that the Doctors complied with BOP policy negates any suggestion

29

that they had the state of mind akin to criminal recklessness required to establish deliberate indifference.  *See Farmer v. Brennan*, 511 U.S. at 825.

### III.    THE DOCTORS ARE ENTITLED TO QUALIFIED IMMUNITY

It is well-established that qualified immunity shields government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  *See also Stanton v. Sims*, 134 S. Ct. at 5; *Reichle v. Howard*, 132 S. Ct. at 2088; *Saucier v. Katz*, 533 U.S. 194 (2001).   Where an official's conduct is objectively reasonable in light of existing law, that official will enjoy protection from liability.  *See Anderson v. Creighton*, 483 U.S. at 639.   "An official is . . . entitled to summary judgment [on the basis of qualified immunity] unless '[t]the contours of the right [were] sufficiently clear that a reasonable official would [have] underst[ood] that what he [was] doing violate[d] that right.' "  *Harris v. District of Columbia*, 932 F.2d 10, 13 (D.C. Cir. 1991) (quoting *Anderson*, 483 U.S. at 640).   Qualified immunity provides not simply a defense to liability, but also "an entitlement not to stand trial or face the other burdens of litigation, conditioned on the resolution of the essentially legal question whether the conduct of which the plaintiff complains violated clearly established law."  *Mitchell v. Forsyth*, 472 U.S. 511 (1985).

30

In considering the defense of qualified immunity, the court analyzes two questions, in either order, and finds qualified immunity when one or both of the answers to these questions favor the government officials:   (1) whether conduct violated a right in the United States Constitution, and (2) whether the right was sufficiently clearly established that a reasonable person would have known that his or her conduct violated the United States Constitution.   *See Pearson v. Callahan*, 555 U.S. 223, 241-242 (2009) (overruling in part *Saucier v. Katz*, 553 U.S. 194 (2001)).   Acosta would need to prevail on both questions to overcome the Doctors' defense of qualified immunity.

     To the extent that Acosta's allegations were sufficient to answer the first question in the affirmative, Acosta's claim would still fail to overcome the Doctors' qualified immunity defense because the law was not so clearly established that BOP doctors in Dr. Nelson's and Dr. Hernandez-Ricoff's positions should have known that their denials of transfers to a BOP medical facility for an elective surgery on Acosta's elbow and arm violated the Eighth Amendment.   *Amicus* has cited no appellate decision that would put a reasonable person on notice that compliance with the Eighth Amendment required the surgery Acosta requested.   Given the BOP's polices, no reasonable BOP doctor in the Doctors' position would have been on notice that failure to transfer Acosta for elective surgery on his elbow violated the

31

Eighth Amendment.   Neither Acosta nor *Amicus* has cited a case even close to the factual situation here.

## IV.   ACOSTA IS NOT ENTITLED TO INJUNCTIVE RELIEF

Although Acosta invoked *Bivens*, he did not seek an amount of damages in his amended complaint. A-40, A-46.   Indeed, it appears from his filings that he may have brought this action to obtain injunctive relief.   *See* A-22 (initial complaint seeking an order instructing BOP to provide him surgery); Response to Magistrate Report, 2009 WL 1405850 (advising the court that he was seeking an order instructing BOP to provide treatment); A-49 (asserting that he is "constitutionally entitled to receive the most needed medical care/surgery").

The case law interpreting *Bivens*, however, is clear that *Bivens* does not support injunctive relief, precisely because *Bivens* assumes the official's misconduct is ascribed to the official's personal capacity, which is why any award of damages under *Bivens* are payable from the official's personal assets.   *Davis v. Passman*, 442 U.S. 228, 245 (1979) (under *Bivens*, "it is damages or nothing.") .

Accordingly, injunctive relief is by definition unavailable on a *Bivens* theory, even though a lawsuit for "injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally."   *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001).

Here, neither of the Doctors have the authority in their personal capacity to transfer Acosta to a BOP medical referral center for surgery.   Therefore, no injunctive relief is available under a *Bivens* theory of personal liability.   Moreover, Acosta has failed to establish a factual foundation for his Eighth Amendment claim that would support meaningful injunctive relief against the BOP, even if it had been made a party to this suit.

## CONCLUSION

For the foregoing reasons, Appellees respectfully submit that the judgment of the District Court should be affirmed.

RONALD C. MACHEN JR.
United States Attorney

R. CRAIG LAWRENCE
Assistant United States Attorney


 /s/    *Judith A. Kidwell*
JUDITH A. KIDWELL
Assistant United States Attorney

## **CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION**

I HEREBY CERTIFY that the foregoing brief complies with the type-volume

limitation of Fed. R. App. P. 32(a)(7)(B) and contains 8283 words.


/s/ *Judith A. Kidwell*
JUDITH A. KIDWELL
Assistant United States Attorney


## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that service of the foregoing Brief for Appellees has

been made through the Court's ECF system on *Amicus*, Rena Andoh, Esq., Sheppard

Mullin Richter & Hampton and by United States mail, postage prepaid, on

Appellant, Enrique Acosta, on this 9th day of December, 2013.


/s/ *Judith A. Kidwell*
JUDITH A. KIDWELL


34

ADDENDUM